Case No. 22-1849, Bad Elf, LLC v. Flex Ltd. Good morning, Your Honors. May it please the Court, I'm Marina Cunningham of McCormick, Balding, and Huber, representing Appellant and Applicant, Bad Elf, LLC. It is our position that the Board made a number of errors in ruling for the opposer. The first error is that the Board never analyzed the goods in Class 9 that are listed on the face of the opposer's registration for Flex Pulse with respect to applicants marked for Flex. Moreover, the Board relied on common law uses that were never pledged in this case. Second, the Board erred in inadequately considering weakness of the marks based on third-party registrations and uses that are nearly identical to those of the opposer. And third, the Board essentially shifted the burden of proof to the applicant from the opposer since the opposer really presented no evidence of either actual confusion or likelihood of confusion based on their registrations. So first, the Board never analyzed the goods for Class 9 for opposers marked Flex Plus versus applicants marked Flex. Specifically, Flex Pulse is registered for computer software for use in supply chain management, whereas Flex Mark was applied for GPS apparatus, apparatus as in technical equipment or machinery used for a particular purpose. There's absolutely no overlap in the goods, and Flex Pulse's registration simply does not cover Flex's applied for goods. So you heard the discussion in the last case, right? I did. Is the record here the same with respect to the use of Flex by the opposer in having occurred after identical marks or identical goods? I'm sorry. I didn't catch the last part. Is the record the same here with respect to the earlier registrations for the Flex Mark for identical goods? Yes, it is. It's very similar. We have very—I'm not sure what registrations they have, but in our case, the Board said that for nearly identical registrations, does not show any sign of weakness, conceptual weakness. Where do they say that? They say that on page—it's page 29 of the Board's opinion. So 0029. No evidence of any conceptual weakness. You're talking about appendix 29? I'm sorry? Appendix page 29? Yes, 0029. 29. Whereas, for example, UPS Mark that well predates the opposer is specifically for computer software used for logistics management. So nearly identical goods for the Flex Mark. But in our case, the goods were never considered on the face of the registration. What the Board did, they relied on a declaration from their former employee, Mr. Bjorn Kilburn, who stated that he remembers that in 2018, they manufactured a GPS apparatus for a third-party company called Geotab. And that would—the Board based its opinion on. First of all, it's common law rights that were never pled in this case, so should not have been admitted. Secondly, even if they did manufacture a GPS product for somebody else, it should be properly classified as services and certainly not goods. And they do have registration for services, manufacturing for others and engineering services for others. That's properly classified. That does not entitle them— they would not be able to get a registration for apparatus when they're manufacturing it for a third party. Additionally, they did it in 2018. There's absolutely no evidence of continued use. They would not have been able to get a registration for it, and they certainly don't have a registration for it. The only goods they have is for Flex Plus, not Flex, and only for computer software for use in supply chain management. And the Board never analyzed the goods in this case. They also ruled it to be a strong mark, which we don't believe. And they did not require any substantial evidence to show likelihood of confusion. There's no actual confusion. So it is our position that the Board made a number of errors. But the biggest one is that they never analyzed the goods, and they admitted common law use that was never pled in this case and would not have been entitled them to a registration. The bottom line is they don't have a registration. They can't rely on common law use because it was never pled. And the mark is weak because there are many uses and registrations that are identical to them, even though it may not rise to the level of 100 uses. But the Board never examined the probative quality of those registrations, which are identical to them, which weakens their mark. There are a lot of other errors that I could go on, but the Board summarily dismissed many of our arguments. They didn't find the fact that— I'll ask the same question I did in the last case. If the Board erred with respect to its analysis of channels of trade, wasn't that harmless error? They're completely different channels of trade. Well, it ultimately does review customers' services and goods. Completely different channels. The opposer markets and sells to huge corporations like Johnson & Johnson, Abbott, and Ford. They sell software for managing their supply chain management and logistics to those huge corporations. Well, the Board held that the goods may be encountered by the same consumers, namely purchasers seeking computer software, mobile apps in the field of chain management and logistics. Nate goes on and says, why isn't that an inadequate review of channels of trade? Well, again, we believe the Board is incorrect. Our applicant's goods is a standalone piece of equipment that is specifically sold to GIS, Geographic Information Systems, professionals. So there's highly knowledgeable professionals who use it for GIS purposes, for surveyors. They're individuals or groups of individuals who make surveys of land. Whereas the opposer's market, again, admitted by them, is Abbott, Johnson & Johnson, huge corporations whose purchasing departments, purchasing agents, make educated decisions which system they purchase. There's huge computer software systems that they purchase. So absolutely different channels of trade, very sophisticated. Even if it was closer, the buyers, the market is composed of very sophisticated people. Very sophisticated. They wouldn't be like a normal consumer. There's no advertising. There's a completely different set of advertising, completely different channels of trade, completely different consumer, and a very sophisticated consumer. The Board did make findings of fact with respect to the issues you're bringing up, correct? Yes. Okay. And this is substantial evidence. As long as we determine that those decisions are supported by substantial evidence, then you lose on this argument. Well, we did provide the evidence that who our consumers are, who we market to, and it's just different markets. And it's inexplicable why the Board decided that they are the same. Well, it's not substantial evidence questions. It explains the state farms. Look, I think the question is, could the consumers of opposers use a GPS device? Well, yeah, GPS devices are ubiquitous. They're everywhere. But the bottom line is their registration does not, they don't sell GPS apparatus, and they don't have a registration for it. And it's different marks, different goods, and completely different channels of trade. Okay. You want to save the rest of your time for the model? Yes, I reserve five minutes. Thank you. Ms. Shensky? Ms. Shersky. Sorry. No worries. Sure. Good morning, and may it please the Court. As this Court has held, varying weights may be assigned to each DuPont factor depending on the evidence presented in the record. And here, the Board assessed the various factors based on which evidence was presented, finding that two of the larger factors, the similarity of the marks and the similarity of the goods and services, weighed in favor of confusion, and finding that the mark was not so conceptually weak that it merited being considered a weaker mark. So are we dealing with a Katie Barbador situation here, where your client came along and was either the third or the fourth registrant for the Plex mark for identical goods and now is trying to prevent a fourth or fifth registration for allegedly similar goods? No, Your Honor. Based on the record, so the records are actually not the same. The third-party use registration evidence in the Bad Elf case is not the same evidence that is in the Spurion case. The Bad Elf case has significantly less evidence. And there are only four registrations of the four third-party registrations. Two of them are Plex, and only one of those Plex registrations came prior to our Plex mark. And it was the USPS registration. So there are three Plex marks for identical goods? If you include ours, they're not for identical goods. They are for the Plex one that was first in time, the UPS one that is for logistics and management-related computer software goods. The second Plex registration, which came after our mark, was registered in 2017. And that's for advanced transportation controller for managing a variety of intelligent transportation systems, including traffic signal control integration with connected or automated vehicles. So we chose not to oppose that mark in this case. But in this case, the applicant's mark, Bad Elf's mark, is Plex. There are no additional words. We have two registrations for Plex and Plex stylized, as well as for Plex Pulse. Turning to the goods and services, there is evidence in the record in the form of admissions that Bad Elf's GPS apparatus and receivers are used for the same purpose and function as Plex's software, and that they're used to track mobile assets, and that they're used generally in the field of telematics. Is it appropriate to do that analysis, or do you have to compare the registrations? You do have to compare the registrations, and they apply for GPS apparatus and GPS receivers in Class 9, with no limitations to channels of trade, no limitations to... And your registration is not for that, right? It is not for GPS apparatus, but we put in evidence in the record that there are third-party registrations that cover their goods and our services under one mark. So that shows that there is a... That shows they're related? Correct. And they also admitted on admissions 23, 25, 26, and 27, which are in the appendix 193 and 194, they admit that they offer GPS positioning apparatus and GPS receivers that are used to record the location of assets, which is related to what logistics services do. They admitted that their GPS apparatus and GPS receivers may be used by consumers in the field of supply chain management and logistics. They also admitted that their GPS apparatus and GPS receivers may be used by consumers in the field of tracking and telematics. And they finally admitted that their consumers can use these to track mobile assets. These are all admissions they put into their record that their goods could be used for the same function as our services. And because their goods can be used for the same purpose, they're related. And with respect to the services, the Class 39 GPS navigational services that the application covered, the board found that those are complementary to our FLEX goods and services because they can be used together. Turning to the commercial strength factor here, the board found that while there was some commercial weakness, that this wasn't enough to demonstrate that FLEX's marks are entitled to a weaker scope of protection, and they found that the marks are still inherently distinctive. All of FLEX's marks are registered on the principal register without any claim of acquired distinctiveness. And there was nothing put forward in the evidence that FLEX was weak in terms of dictionary definition or anything with respect to conceptual weakness. And finally, the marks are identical with respect to the two FLEX registrations, and they're highly similar with respect to the FLEX and FLEX Pulse registration. And with respect to the channels of trade, again, there are no limitations in the application. That would suggest that their goods and services are limited to, as opposing counsel has said, the GIS industry. There is nothing in the record to say that their application was very broad, that it could go to any other consumers. So it's simply not sufficient to say, well, they're being used this way. And they do have a registration for bad LFLEX, which was not opposed, and that is the mark they're using in commerce. So to any extent that they're claiming that there wasn't any evidence of actual confusion, there can't be actual confusion because they're not using the mark FLEX on its own, they're using bad LFLEX, which we did not oppose. And just to address the conversations that went on earlier with Jack Wolfskin and Juice Generation, in Jack Wolfskin the market issue was a paw print, so they looked for evidence of similar paw prints, and there were 14 uses and registrations, and this court found that that was probative of weakness. With Juice Generation, there were 26 uses and registrations incorporating the three-word phrase, peace and love, and it was and juice in that case, and they found that was probative. There is a TTAB case that found 10 uses of the mark smoking hot coupled with the dictionary definition to be probative that the mark was weak. There's another TTAB case, TPI Holdings, that said 67 third-party registrations and numerous uses of traitor-other words formative marks was sufficient to show weakness. This court in I Am Symbolic found that where the conflicting marks are identical, which is the case here, evidence of the coexistence of cited registrations of two marks that are identical, which is also the case here, was not sufficient to say that the mark is so weak that it is entitled to a weaker scope of protection. And finally, there's another case that found that four third-party registrations and no third-party uses was not enough. And the board did consider all of the third-party uses and registrations in the record, and they did find that there was some commercial weakness just that didn't rise to the level to claim that the mark is not entitled to not allowing an identical mark to register on the register. And what was the TTAB case that involved two prior registrations? That was actually a Federal Circuit case, I Am Symbolic. It was the Will.I.Am case. Is that cited in here, Brady? I believe it might be. This is a USPQ citation, so I'm not sure that's going to help you. I actually think the board decision might cite to it, too. Okay. No, they cite to Jews. Omaha. What is the citation? Sure. It's 120. It is 866 F.3D 1315. I'm sorry, say that again. Sorry, 866 F.3D 1315. And they were identical marks? They were identical marks. For identical goods? I think they were for the same mark for the same or similar goods, and they just said that fell short of ubiquitous. And this court found that it fell short of ubiquitous or considerable use. That was present in Jack Wolfskin and Jews Generation. But the case is not cited in your brief, and you don't know why not at all. You should tell opposing counsel about that in advance so they have an opportunity to respond. I could see if it's in my brief. I did not cite to that case in the brief, but I was just trying to show you ways, since we were discussing this earlier about circumstances where this court and the CTAB has found that there was enough for ubiquitous use. Okay, but the point still holds. You should tell opposing counsel about that if you have additional authority. Okay. And then with respect to the marks, they conceded that flex and flex were the same, and the board analyzed flex's flex pulse mark in its entirety and found that the dominant word was flex, which is the only word an applicant's marking that. Due to the propensity of consumers to potentially shorten words from time to time, they could believe that there was an association with Bad Elf's flex mark with flex's flex pulse mark. If there are no further questions, I would just like to briefly conclude that substantial evidence supports the board's decision that confusion is likely and this court should affirm. Okay. Thank you, Ms. Schorstein. Ms. Cunningham, do you want to get started? I actually have four minutes. Are you familiar with the case that she just referred to? I'm sorry? Are you familiar with the case she just mentioned? No, I'm not. Okay. We cited to Minnie Meltz. It's a TTAB case that we cited in our brief that states that the probative value of other registration is critical, and it depends on what kind of marks they are. So it's not only just the quantitative number. It's really qualitative issue. And we cited to that case. In terms of the flex versus flex pulse, the flex marks that they've asserted against us do not have any registration for goods. They're only for services. The only mark asserted against our goods is the flex pulse mark with the goods for computer software for use in supply chain management. So saying that the goods are the same and perform the same function is just not feasible. And as far as the third-party registrations that they have cited that include both GPS apparatus and the services that are somewhat related to their services, that's a non-starter. There are many conglomerates that make a lot of different things. For example, General Electric used to make jet engines, stoves, refrigerators. Other companies don't. Pratt & Whitney only makes jet engines. So they're different companies. Some companies make everything, and some companies don't. They don't make the product. They don't have a registration to the product. Different channels of trade, and they're not going to the same consumers. So other than showing a third-party registration that includes both goods and services, in our opinion, is not sufficient evidence to show likelihood of confusion between our mark flex and their flex pulse. That is registered only for computer software for a very specific use, for a very weak mark. I guess I can go on, but if you have any questions. Okay. Thank you. Thank you very much. That concludes our session for this morning.